## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## MARTINSBURG

**DAVID M. BEDWELL,**

       **Plaintiff,**

**v.**                             **Civil Action No.: 3:08-CV-149**
                                               **JUDGE BAILEY**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       **Defendant.**

## REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [18] AND DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [16] AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

## I.      INTRODUCTION

On October 8, 2008, Plaintiff David M. Bedwell ("Plaintiff"), by counsel Lawrence E. Sherman, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner") pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). On December 8, 2008, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and Administrative Transcript of the proceedings. On February 22, 2009 and March 17, 2009, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment [16] [18]. Following review of the motions by the parties and the transcript of administrative proceedings, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.     RELEVANT PROCEDURAL AND FACTUAL BACKGROUND AND REVIEW OF ADMINISTRATIVE LAW JUDGE DECISION

### A.     Procedural Background

On July 23, 2003, Plaintiff applied for disability insurance benefits, alleging disability since October 21, 1993.[1]  On July 26, 2005, the Administrative Law Judge ("ALJ") held  a hearing ("ALJ Hearing"), and the Plaintiff testified under oath.[2]   On January 10, 2006, the ALJ issued an unfavorable decision to the Plaintiff, finding him not entitled to disability insurance benefits.[3]

### B.     Standard for Judicial Review of a Decision by the Administrative Law Judge in a Disability Case

> Judicial review of a final decision regarding disability benefits is limited to determining whether the findings...are supported by substantial evidence and whether the correct law was applied.  *See* 42 U.S.C. § 405(g).   "The findings...as to any fact, if supported by substantial evidence, shall be conclusive" *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  *See Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938))...Substantial evidence...consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance...Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment...if the decision is supported by substantial evidence.  *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir.1962).  Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. *King v. Califano*, 599 F.2d 597, 599 (4th Cir.1979).  **"This**

---

[1] *See* Tr. at 84; *see also* Comm'r. Doc. 19 at 2; *see also* Pl. Doc. 17 at 1.

[2] *See* 20 C.F.R. § 404.929 (hearing before an administrative law judge); *see also* Tr. at 19 & 31-32; *see also* Comm'r. Doc. 19 at 2; *see also* Pl. Doc. 17 at 2.

[3] *See* Tr. at 26.

**Court does not find facts or try the case *de novo* when reviewing disability determinations."** *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir.1976); "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of non-persuasion." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir.1972). "The language of the Social Security Act precludes a *de novo* judicial proceeding and requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"

*See Hays v. Sullivan*, 907 F.2d 1453 (4th Cir. 1990) (emphasis added). With these standards in mind, the Court reviews the decision by the ALJ.

## C.      Standard for Disability and Five-Step Evaluation Process

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work..."[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A). In order for the ALJ to determine whether a plaintiff is disabled and therefore entitled to disability insurance benefits, the Social Security Administration has established a five-step sequential evaluation process. The five steps are as follows (including Residual Functional Capacity Assessment before Step Four):

Step One:      Determine whether the plaintiff is engaging in substantial gainful activity;

Step Two:      Determine whether the plaintiff has a severe impairment;

Step Three:      Determine whether the plaintiff has "listed" impairment;

* Residual Functional Capacity Assessment *
(Needs to be Determined Before Proceeding to Step Four)

Step Four:     Compare residual functional capacity assessment to determine whether the

plaintiff can perform past relevant work;

Step Five:     Consider residual functional capacity assessment, age, education, and

work experience to determine if the plaintiff can perform any other

work.

*See* 20 C.F.R. § 404.1520 (evaluation of disability in general).  In following the five-step process

and coming to a decision, the ALJ makes findings of fact and conclusions of law.  This Court will

review the decision by the ALJ to determine whether it is supported by substantial evidence, in

accordance with 42 U.S.C. § 405(g) and *Hays*.

**D.      Review of ALJ Application of Five-Step Evaluation Process and Whether it is Supported by Substantial Evidence**

**1.      Step One: Determine whether the Plaintiff is Engaging in Substantial Gainful Activity**

Substantial gainful activity is work activity that is both substantial and gainful:

(a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.

(b) Gainful work activity. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized....

Generally, in evaluating your work activity for substantial gainful activity purposes, our primary consideration will be the earnings you derive from the work activity...

> If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled ***regardless of your medical condition*** or your age, education, and work experience.

*See* 20 C.F.R. § 404.1572; *see also* 20 C.F.R. § 404.1574(a)(1) (evaluation guide for employees who are not self-employed); *see also* 20 C.F.R. § 404.1520(b) (emphasis added).

The ALJ found that Plaintiff has not engaged in substantial gainful activity at any time relevant to this decision.[4]  The parties do not dispute the ALJ's findings in Step One.

### 2.      Step Two: Determine whether the Plaintiff has a Severe Impairment

> [A] severe impairment...is any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities...
>
> An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.  Basic work activities...mean[s] the abilities and aptitudes necessary to do most jobs.  Examples of these include--1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

*See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521; *see also Luckey v. U.S. Dept. of Health & Human Services*, 890 F.2d 666 (4th Cir. 1989).  The ALJ found Plaintiff to have the following severe impairments: herniated disc at L5-S1 with a left radiculopathy, degenerative disease of the cervical spine, and chronic impingement syndrome of the left shoulder.[5]  In addition, Plaintiff contends that he has severe impairments from hearing loss, cervical and lumbar disc disease,

---

[4] *See* Tr. at 21.

[5] *See* Tr. at 21.

cervical and lumbar radiculitis, myofascial back pain, chronic headaches, heel spurs, carpal tunnel,[6] and left AC joint surgery.[7]  With regard to Plaintiff's complaints of cervical and lumbar disc disease, cervical and lumbar radiculitis, myofascial back pain, chronic headaches, and left AC joint surgery, the ALJ considered these conditions in his determinations of Plaintiff's severe impairments:

> [C]laimant underwent left acromioclavicular joint surgery in November 1988 with excision of his distal clavicle...The claimant also injured his back in November 1989.  Subsequent to this injury, he had low back and left leg pain...X-rays of the claimant's neck in 1988 revealed arthritis at C3-4...An examination in August 1989...revealed mild to moderate tenderness over the left cervical paraspinous muscles...[I]n November 1990...claimant alleged pain on full range of neck motion and discomfort when holding his head in any set position...An MRI of the cervical spine in April 2000 revealed an osteophyte complex at C5-6 and C6-7 with mild stenosis and neuroforaminal narrowing on the left...An x-ray of the claimant's left shoulder in September 1991 showed evidence of acromioclavicular joint widening suggesting instability...A bone scan in February 1996 showed that the claimant had some increased acromioclavicular joint activity on the right, possibly related to post traumatic arthritis...[I]n 1998...claimant [was diagnosed] with lumbar radiculitis, cervical / lumbar myofascial pain, herniated disc left L5-S1, left shoulder pain and a history of headaches...[O]n February 28, 2003, [claimant was diagnosed with] diminished range of motion of the cervical spine...

*See* Tr. at 22-23.  The ALJ noted that on October 16, 1990, (prior to Plaintiff's alleged disability date of October 21, 1993) a test revealed that Plaintiff had severe hearing loss.[8]  At the ALJ Hearing, Plaintiff testified, "Well, I'm deaf in my right ear.  I lost hearing back in 1984...I don't hear out of my right ear."[9]  However, the ALJ found that the condition had not affected Plaintiff's ability to

---

[6] Plaintiff contends that he has a severe impairment of carpal tunnel.  *See* Pl. Doc. 17 at 9.  However, Plaintiff did not present any evidence of a carpal tunnel condition interfering with his work and admitted that, "I thought I might have carpal tunnel, but I was tested for it with negative results."  *See* Tr. at 163.

[7] *See* Pl. Doc. 17 at 3 & 9.

[8] *See* Tr. at 22; *see also* Comm'r. Doc. 19 at 7; *see also* Pl. Doc. 17 at 3.

[9] *See* Tr. at 34.

work.[10]  Notwithstanding Plaintiff's hearing loss in 1984, Plaintiff was able to work with this hearing

loss from 1984 through the date of receiving his left shoulder injury at work in January 1988.[11]

Thereafter, Plaintiff continued at work on light duty until a back injury at work in November 1989.[12]

Plaintiff then worked from March 1990 until August 1990 and September 1993 until October 1993.[13]

Plaintiff did not attribute any of his absences from work due to his hearing loss.[14]  Therefore,

substantial evidence supports the ALJ's decision that Plaintiff's hearing loss is not a "severe

impairment" because it does not significantly limit his ability to do basic work activities.

Plaintiff contends that his heel spurs are a severe impairment.[15]  The ALJ found that there

was no evidence to establish that Plaintiff had any residuals from this impairment that would affect

his ability to perform work related functions.[16]  Plaintiff has very few medical records addressing

his heel spurs.  In June 1989, Dr. James Faulk diagnosed a heel spur on Plaintiff's left heel and

recommended a heel orthotic.[17]  In October 1989, the Plaintiff went to Dr. James Suber regarding

his left heel pain and reported to Dr. Suber that during work he had to stand for long hours on a

cement floor.[18]  Dr. Suber noted that operating on the heel spur will probably be necessary to give

---

[10] *See* Tr. at 22.

[11] *See* Tr. at 128 & 176.

[12] *See* Tr. at 128.

[13] *See* Tr. at 128-29.

[14] *See* Tr. at 128-30.

[15] *See* Pl. Doc. 17 at 9.

[16] *See* Tr. at 22.

[17] *See* Tr. at 210.

[18] *See* Tr. at 211.

him relief.[19]  Dr. Suber also referenced that working eight to ten hours a day on a cement floor is aggravating the condition.[20]  Plaintiff did not submit further evidence of a residual heel spur injury. Therefore, substantial evidence supports the ALJ's decision that Plaintiff's heel spurs are not a "severe impairment" because it does not significantly limit his ability to do basic work activities.

**3.      Step Three: Determine whether the Plaintiff has a "Listed" Impairment**

> If you have an impairment(s) that meets or equals one of our listings in appendix 1 of [Subpart P of Part 404] and meets the duration requirement, we will find that you are disabled. *See* 20 C.F.R. § 404.1520(d).

> The Listing of Impairments...describes...impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. *See* 20 C.F.R. § 404.1525(a).

> Most of the listed impairments are permanent or expected to result in death.  *See* 20 C.F.R. § 404.1525(a).

> We need evidence from acceptable medical sources (e.g. licensed physicians) to establish whether you have a medically determinable impairment(s).  *See* 20 C.F.R. § 404.1513(a).

> To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies ***all of the criteria*** in the listing.  *See* 20 C.F.R. § 404.1513(a) (emphasis added).

> ***An impairment that manifests only some of those criteria, no matter how severely, does not qualify***.  *See Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885 (1990) (emphasis added).

---

[19] *See* Tr. at 211.

[20] *See* Tr. at 211.

### a.     Listing Impairment 1.04 Disorders of the Spine

Plaintiff contends that he meets the criteria for Listing Impairment 1.04 Disorders of the

Spine.[21]  In order to satisfy the criteria for Listing Impairment 1.04 Disorders of the Spine, the

Plaintiff must establish:

> Listing 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.
>
> 1.00B2b: (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.
>
> (2) To ambulate effectively, individuals must be capable of sustaining

---

[21] *See* Pl. Doc. 17 at 6-8.

a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.00 & 1.04. The ALJ noted that the Plaintiff has herniated nucleus pulposus, which is one of the conditions mentioned in Listing 1.04.[22] However, the ALJ found that in order to qualify for the Listing 1.04 Impairment, the condition must be accompanied by motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).[23] The ALJ further found that Plaintiff's herniated disc is not accompanied by spinal arachnoiditis or lumbar spinal stenosis resulting in the inability to ambulate effectively.[24] Plaintiff states that he was referred to a pain management program and can only lift ten (10) pounds.[25] The ALJ considered this in his decision but found that Plaintiff's symptoms did not meet the criteria for Listing Impairment 1.04.[26] The ALJ considered an MRI dated April 28, 2000, which found "mild degenerative spondylitic changes at L4-5 and L5-S1. Mildly eccentric to the left concentric disc bulge at L5-S1 very minimally abuts the descending S1 roots. There have been no

---

[22] *See* Tr. at 23.

[23] *See* Tr. at 23; *cf.* Tr. at 257 & 398 (Plaintiff had a negative straight-leg test).

[24] *See* Tr. at 23.

[25] *See* Pl. Doc. 17 at 7-8.

[26] *See* Tr. at 23-24.

changes from a previous MRI scan in 1997."[27]  Therefore, substantial evidence supports the ALJ's decision that Plaintiff does not meet the criteria for Listing Impairment 1.04.

   b.      **Listing Impairment 1.02 Major dysfunction of a joint(s) (due to any cause)**

   The ALJ also found that Plaintiff did not meet the criteria for Listing Impairment 1.02.  In order to satisfy the criteria for Listing Impairment 1.02 Major dysfunction of a joint(s) (due to any cause), the Plaintiff must establish:

> Listing 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). ***With:***
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or
>
> B.  Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.
>
> 1.00B2c: What we mean by inability to perform fine and gross movements effectively. Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or

---

[27] *See* Tr. at 22 & 269.

above waist level.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.00 & 1.02 (emphasis added). The ALJ found that Plaintiff did not meet the criteria for Listing 1.02 because Plaintiff is able to perform fine and gross movements effectively.[28] The ALJ noted that (subsequent to his left shoulder injury in January 1988 and his back injury in November 1989), Plaintiff was able to rebuild an automobile engine.[29] Plaintiff responds that this information should not be relevant because it occurred prior to his onset of disability in 1993.[30] However, Plaintiff's activities after 1993 are similar to his ability to rebuild an automobile engine in 1991. In 2003, Plaintiff stated that he built an 8' x 8' storage barn.[31] Plaintiff further acknowledged that he cares for all of his own personal needs, prepares meals, does laundry, vacuums, pays bills, does household repairs, mows the lawn, manages bank accounts, runs errands, takes out the trash, goes shopping, reads magazines, reads newspapers, watches TV, goes to movies, attends church twice a week, visits with friends and family, and "tinkers" with mechanical things.[32]

At the ALJ Hearing on July 26, 2005, Plaintiff testified that on "good" days he may vacuum, unload the dishwasher, mow the grass, do odds and ends, do whatever needs to be done around the house, go to town to buy groceries or pay bills.[33] Plaintiff also sweeps the house when necessary, does his laundry, will do some cooking, drives to town two to three times per week, and occasionally

---

[28] *See* Tr. at 23.

[29] *See* Tr. at 23-24 & 220.

[30] *See* Pl. Doc. 17 at 1 & 8.

[31] *See* Tr. at 118.

[32] *See* Tr. at 54-56 & 115-18.

[33] *See* Tr. at 55.

drives to Hagerstown, Maryland.[34]

The C.F.R. provides examples of the inability to perform fine and gross movements effectively, including the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.[35]  From Plaintiff's activities after his alleged onset of disability in 1993, substantial evidence supports the ALJ's decision that Plaintiff does not meet the criteria for Listing Impairment 1.02.

### c.        Listing Impairment 12.04 Affective Disorders

Finally, Plaintiff contends that he meets the criteria for Listing Impairment 12.04 Affective Disorders due to anxiety and depression.[36]  In referencing the psychiatric evaluation on August 20, 2005, the ALJ acknowledged that Plaintiff "may very well have a depressive disorder now."[37] However, the ALJ found that Plaintiff must establish the existence of a depressive disorder prior to September 30, 1998, which was the date he was last insured by Social Security.[38]

> [I]nsured status under the social security program...is a basic factor in determining if you are entitled to...disability insurance benefits or to a period of disability...The rules for determining if you are insured for purposes of establishing a period of disability or becoming entitled to disability insurance benefits are in §§ 404.130 through 404.133.  Whether you have the required insured status depends on the number of quarters of coverage (QCs) you have acquired...
>
> To establish a period of disability, you must have disability insured

---

[34] *See* Tr. at 56.

[35] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2c.

[36] *See* Pl. Doc. 17 at 1, 3, & 9-11.

[37] *See* Tr. at 21 & 366-74.

[38] *See* Tr. at 21; *see also* Comm'r. Doc. 19 at 3; *see also* Pl. Doc. 17 at 9.

> status in the quarter in which you become disabled or in a later quarter in which you are disabled.
> *See* 20 C.F.R. § 404.101(a); *see also* 20 C.F.R. § 404.131(a).
>
> To qualify for disability insurance benefits, [the plaintiff] must prove that [he] became disabled prior to the expiration of [his] insured status. 42 U.S.C.A. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §§ 404.101(a), 404.131(a); see also *Henley v. Comm'r of Soc. Sec.*, 58 F.3d 210, 213 (6th Cir.1995) (upholding denial of disability insurance benefits where claimant failed to prove disability prior to loss of insured status); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1458 (9th Cir.1995) (holding that "individuals who apply for benefits under the [Social Security] Act after the expiration of their insured status, for a disability that prevents substantial gainful activity at the time of the application, must show that the current disability has existed continuously since some time on or before the date that their insured status lapsed"); *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir.1991) (upholding denial of disability insurance benefits where claimant alleged onset of disability three years after the date last insured).

*See Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005). Plaintiff was last insured by Social Security on September 30, 1998. Therefore, Plaintiff needs to prove that he suffered from the impairment of depression on or before September 30, 1998. However, there is no evidence that Plaintiff suffered from depression prior to his last insured date.[39] Accordingly, substantial evidence supports the ALJ's decision that the Plaintiff did not meet the criteria for Listing Impairment 12.04 prior to the expiration of his insured status.

---

[39] *See* Tr. at 21-22; *see also* Comm'r. Doc. 19 at 12-13; *see also* Pl. Doc. 17 at 9-10.

## * Residual Functional Capacity Assessment *
### (Needs to be Determined Before Proceeding to Step Four)

If your impairment(s) does not meet or equal a listed impairment, we will assess and make a finding about your residual functional capacity based on all the relevant medical and other evidence in your case record...We use our residual functional capacity assessment at the fourth step of the sequential evaluation process to determine if you can do your past relevant work...and at the fifth step of the sequential evaluation process (if the evaluation proceeds to this step) to determine if you can adjust to other work...

Residual functional capacity assessment. Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is the most you can still do despite your limitations. We will assess your residual functional capacity based on all the relevant evidence in your case record....

Residual functional capacity is a measurement of the most a claimant can do despite his limitations. *See* 20 C.F.R. § 404.1545(a). According to the Social Security Administration, residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Regulation (SSR) 96-8p. Residual functional capacity is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain). *See* 20 C.F.R. § 404.1529(a).

*See* 20 C.F.R. § 404.1520(e); *see also* 20 C.F.R. § 404.1545(a); *see also Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006). The ALJ considered Plaintiff's severe impairments, pain symptoms, physical and mental limitations, and the medical evidence to find that Plaintiff has a residual functional capacity to perform light work.[40]

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.

---

[40] *See* Tr. at 23-25.

> Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

See 20 C.F.R. § 404.1567(b). Specifically, the ALJ found that Plaintiff had the residual functional capacity to sit for 6 hours in an 8 hour workday, to stand / walk for 6 hours in an 8 hour workday, to lift / carry 10 pounds on a frequent basis and 20 pounds on an occasional basis, and could push/pull on an unlimited basis.[41]

### a.    Plaintiff's Symptoms of Pain

Plaintiff asserts that the ALJ failed to consider his subjective complaints of pain.[42] The ALJ found that Plaintiff's complaints of pain are disproportionate with and not supported by the objective and substantial evidence in the record.[43]

> [S]tatements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.

See 20 C.F.R. § 404.1529(a). In September 1998, Plaintiff rated his pain as 3 out of 10.[44] In June

---

[41] See Tr. at 24.

[42] See Pl. Doc. 17 at 3.

[43] See Tr. at 24.

[44] See Tr. at 257.

2000, Plaintiff rated his pain as 2 to 3 out of 10.[45]  In December 2000, Plaintiff rated his pain as 3 out of 10.[46]  At the ALJ Hearing in July 2005, Plaintiff rated his pain on average as 4 out of 10.[47]

The ALJ found that Plaintiff has been treated with only conservative measures.[48]  In December 2000, Plaintiff reported that he stopped all medications.[49]  In September 2003, the a State Agency Medical Consultant reported "no indication of pain medication being taken."[50]  At the ALJ Hearing, Plaintiff testified that he only takes pain medication when "it's really giving me problems."[51]  Plaintiff testified that the only pain medication he takes is Motrin 3 to 4 times a week.[52]  Plaintiff further testified that he had not seen a physician in "probably over a year and a half."[53]  Plaintiff testified that he cannot afford to see a doctor or buy pain medication.[54]  However, Plaintiff reported that he currently lives with his parents and receives alimony from his ex-wife.[55]

> The ALJ's conclusion that [plaintiff's] complaints of pain were not consistent with the evidence, when evaluated under the Social Security Ruling's factors, is supported by substantial evidence.  The medication originally prescribed to [the plaintiff] is described as medication for the relief of mild to moderate pain.  In addition, even

---

[45] *See* Tr. at 253.

[46] *See* Tr. at 249.

[47] *See* Tr. at 47.

[48] *See* Tr. at 24.

[49] *See* Tr. at 249.

[50] *See* Tr. at 297.

[51] *See* Tr. at 50.

[52] *See* Tr. at 49-50.

[53] *See* Tr. at 24 & 51.

[54] *See* Tr. at 24, 49, & 51.

[55] *See* Tr. at 53 & 59.

when prescribed pain medication, [the plaintiff] failed to fill the prescription-an action leading at the least to the inference that there was no significant pain. [The plaintiff] also discontinued his physical therapy sessions, failed to sustain a consistent medical regimen for treatment of back pain, and required no hospitalizations for back pain. The ALJ's determination that [the plaintiff's] subjective complaints of pain did not comport with the evidence is supported by substantial evidence and is an acceptable credibility determination based upon specific evidence in the record. *See Smith v. Schweiker*, 719 F.2d 723, 723 n. 2 (4th Cir. 1984).

*See Hunter v. Sullivan*, 993 F.2d 31 (4th Cir. 1992). Plaintiff further testified that on bad days he can lift 10 pounds but it is difficult to walk through his house, and on good days, he can "walk a couple of miles" and lift "50 pounds."[56] The ALJ also considered Plaintiff's many daily activities and chores in his evaluation, which were detailed under Step Three of this Report and Recommendation.[57] The ALJ found that Plaintiff's use of conservative measures to treat his pain and his level of activity support the finding that Plaintiff can perform light work.[58]

### b. Plaintiff's Medical Evidence from Treating Sources

Plaintiff contends that the ALJ ignored the objective and clinical evidence from Plaintiff's treating sources in evaluating his disability.[59] "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." *See* 20 C.F.R. § 404.1527(b). The ALJ reviewed Plaintiff's entire medical history, including before the alleged disability date of October 21, 1993 and after the date last insured of

---

[56] *See* Tr. at 24, 44, & 46.

[57] *See* Tr. at 24; *see also supra* discussion of Plaintiff's Daily Activities in Section II.D.3.b. of this Report and Recommendation.

[58] *See* Tr. at 23-25.

[59] *See* Pl. Doc. 17 at 4-6.

September 30, 1998.[60]

In January 1989, Dr. Michael Green, an orthopaedic surgeon, reported that Plaintiff's complaint of pain in his shoulder is the same as before surgery.[61] Dr. Green further stated:

> I can passively take [Plaintiff] to full forward elevation and [Plaintiff] can hold it there, however, he really puts up a fuss and looks like he can't hold it. This is very disturbing and I am not sure what his motivational status is at this time. Arthroscopically, the tendon had no evidence of irritation and he had no inflammatory bursae. He had no synovitis about the anterior chamber nor about the subacromial space.

*See* Tr. at 204. In March 1989, Dr. Green noted that Plaintiff has full range of motion of his arm, and there is a lack of physical evidence to support a lot of Plaintiff's pain complaints.[62]

In August 1989, Dr. Thomas Holbrook, a neurological surgeon, evaluated Plaintiff and found a normal range of motion of the cervical spine with discomfort in the neck with rotation to the left.[63] Dr. Holbrook reported no appreciable spasm to palpation.[64] Dr. Holbrook reviewed x-rays of the cervical spine from March and June 1988, which showed no acute disease.[65] An EMG in April 1989 and a bone scan in April 1988 of the skull, cervical spine, thoracic spine, and shoulders were all normal.[66] Dr. Holbrook concluded that Plaintiff's symptoms were related to the skeletal pathology

---

[60] *See* Tr. at 21-24.

[61] *See* Tr. at 204.

[62] *See* Tr. at 204 & 478.

[63] *See* Tr. at 209.

[64] *See* Tr. at 209.

[65] *See* Tr. at 209.

[66] *See* Tr. at 209.

of the left shoulder, and he found no evidence of cervical radiculopathy.[67]  Dr. Holbrook referred

Plaintiff back to Dr. Green, for further evaluation and treatment.[68]  In October 1989, Dr. Green

released Plaintiff to restricted light duty with minimal overhead activity.[69]  In January 1990, J. Talley

Parrott, M.D., placed Plaintiff on light duty with no repetitive walking, standing, or sitting and no

lifting over 10-15 pounds.[70]  Plaintiff notes that this medical report was not available to the ALJ, and

therefore, the Court should remand for further consideration.[71]  "Evidence is new within the meaning

of this section if it is not duplicative or cumulative...[e]vidence is material if there is a reasonable

possibility that the new evidence would have changed the outcome."  *Wilkins v. Secretary, Dept. of

Health and Human Services*, 953 F.2d 93 (4th Cir. 1991).  The Court finds that the 1990 report by

Dr. Parrott is substantially similar to other reports during the time period, and therefore, it is not

"new" or "material" to warrant a remand.

In June 1994, upon re-evaluation of work-related restrictions, Plaintiff had no pain to

palpation and was restricted to no lifting greater than 20 pounds, and no prolonged standing, sitting,

or walking.[72]  In March 1995, Plaintiff reported that after 6 physical therapy visits, his pain

decreased in his neck and low back, and his range of motion increased in his cervical spine.[73]

---

[67] *See* Tr. at 209.

[68] *See* Tr. at 209.

[69] *See* Tr. at 197.

[70] *See* Tr. at 452.

[71] *See* Pl. Doc. 17 at 9.

[72] *See* Tr. at 197.

[73] *See* Tr. at 233.

Plaintiff said he felt about 50% improved since the initiation of therapy.[74]  In January 1996, Plaintiff reported that after 9 physical therapy visits, his pain decreased in his left shoulder, left buttocks, and thigh, and his range of motion increased.[75]  Plaintiff said that he was sleeping better and overall he felt about 75% improved since the initiation of therapy.[76]

In May 1998, Dr. Holbrook referred Plaintiff to a chronic pain specialist, Iva Chapple, M.D.[77]  In September 1998, Plaintiff reported that the treatment plan from the chronic pain specialist improved his pain relief by 30%.[78]  Plaintiff further stated that he was sleeping better, was more rested, the radiculitis in his leg was decreased, and he was a little more active.[79]  Plaintiff also said that the steroid injections gave him some relief.[80]  In June 2000, Plaintiff reported to Dr. Chapple that medications lessen his pain.[81]  Plaintiff said his sleep was greatly improved to 8 to 9 hours per night and most nights were uninterrupted by pain.[82]  Dr. Chapple noted that Plaintiff's neck was supple with full range of motion and no masses or trachea midline.[83]

In November 2003, Thomas Knutson, D.O., of the Center for Orthopedic Excellence,

---

[74] *See* Tr. at 233.

[75] *See* Tr. at 242.

[76] *See* Tr. at 242.

[77] *See* Tr. at 259.

[78] *See* Tr. at 259.

[79] *See* Tr. at 259.

[80] *See* Tr. at 259.

[81] *See* Tr. at 253.

[82] *See* Tr. at 253.

[83] *See* Tr. at 253.

reported that Plaintiff has very good range of motion.[84]

### c.    State Agency Medical Consultant Reports

In September 2003, a State Agency Medical Consultant Physician reviewed Plaintiff's medical history and determined that Plaintiff could do medium exertional work.[85] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).  The State Agency Physician further found that Plaintiff could occasionally lift 50 pounds, could frequently lift 25 pounds, could stand for 6 hours in an 8 hour workday, could sit for 6 hours in an 8 hour workday, and could push/pull on an unlimited basis.[86]  The State Agency Physician determined that he had no limitations for climbing, balancing, stooping, kneeling, crouching, or crawling.[87]  The Physician further found that Plaintiff had no limitations for reaching, including overhead, no hearing limitations, no limitations to avoid temperature extremes, humidity, noise, vibration, or hazards of machinery and heights.[88]

In January 2004, another State Agency Medical Consultant Physician reviewed Plaintiff's medical history and determined that Plaintiff could do light work.[89]  The State Agency Physician further found that he could occasionally lift 20 pounds, could frequently lift 10 pounds, could stand for 6 hours in a 8 hour workday, could sit for 6 hours in a 8 hour workday, and could push/pull on

---

[84] *See* Tr. at 277 (Dr. Knutson report); *c.f.* Tr. at 260 (business card for Dr. Knutson).

[85] *See* Tr. at 293.

[86] *See* Tr. at 293.

[87] *See* Tr. at 294.

[88] *See* Tr. at 295-96.

[89] *See* Tr. at 315.

an unlimited basis.[90]  The State Agency Physician determined that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, or crawl.[91]  The Physician further found that he had a limited ability for reaching overhead but had no hearing limitations and no limitations to avoid humidity, noise, or vibration.[92]  The Physician noted that Plaintiff should avoid extreme temperatures and hazards of machinery and heights.[93]

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence...
>
> When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician or psychologist, the administrative law judge will evaluate the findings using relevant factors in paragraphs (a) through (e) of this section, such as the physician's or psychologist's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations provided by the physician or psychologist, and any other factors relevant to the weighing of the opinions. Unless the treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources...

[90] *See* Tr. at 315.

[91] *See* Tr. at 316.

[92] *See* Tr. at 317-18.

[93] *See* Tr. at 318.

*See* 20 C.F.R. § 404.1527(f)(2).  The ALJ attributed great weight to the opinions of the State Agency Physicians.[94]  The ALJ found that "the duration and intensity of the claimant's alleged pain and other symptoms are adequately addressed and accommodated in the above residual functional capacity" (i.e., light work).[95]  The ALJ also found the light work assessment as consistent with the medical evidence from Plaintiff's treating doctors.[96]  Plaintiff asserts that the ALJ did not give his credibility and testimony substantial weight.[97]  However, the ALJ did consider Plaintiff's testimony and the medical evidence to conclude that he could only perform light work, as opposed to his prior employment as a forklift operator and process technician, which was categorized as heavy-exertional work.[98]  Accordingly, substantial evidence supports the ALJ's Residual Functional Capacity Assessment that Plaintiff can perform light work.[99]

### 4. Step Four: Compare Residual Functional Capacity Assessment to Determine whether the Plaintiff Can Perform Past Relevant Work

> At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. 20 C.F.R. § 404.1520(a).
>
> Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it.

---

[94] *See* Tr. at 24 .

[95] *See* Tr. at 24.

[96] *See* Tr. at 24.

[97] *See* Pl. Doc. 17 at 6-7.

[98] *See* Tr. at 24-25 (ALJ decision accommodating Plaintiff's pain symptoms and medical evidence); *c.f.* 20 C.F.R. § 404.1567(c) (defining heavy work to involve lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds).

[99] Plaintiff contends that his Residual Functional Capacity should be reduced by 10% due to absenteeism, but there is no evidence in the record to support this allegation.  *See* Pl. Doc. 17 at 4.

20 C.F.R. § 404.1560(b).

> Your impairment(s) must prevent you from doing your past relevant work. If we cannot make a determination or decision at the first three steps of the sequential evaluation process, we will compare our residual functional capacity assessment...with the physical and mental demands of your past relevant work. (See § 404.1560(b).) If you can still do this kind of work, we will find that you are not disabled. *See* 20 C.F.R. § 404.1520(f).

The ALJ found that Plaintiff is unable to perform his past relevant work involving heavy exertion as a forklift operator and process technician.[100] The parties do not dispute the ALJ's findings in Step Four.

**5.      Step Five: Consider Residual Functional Capacity Assessment, Age, Education, and Work Experience to Determine if the Plaintiff Can Perform Any Other Work**

> At the fifth and last step...

> [i]f we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work. We will look at your ability to adjust to other work by considering your residual functional capacity and your vocational factors of age, education, and work experience. Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

*See* 20 C.F.R. § 404.1520(a); *see also* 20 C.F.R. § 404.1560(c). At the final step of the disability analysis, the ALJ considered Plaintiff's residual functional capacity assessment combined with his age, education, and work experience to determine whether Plaintiff could perform any other work.

---

[100] *See* Tr. at 25.

#### a. The ALJ Considered Plaintiff's Age, Education, and Work Experience

The ALJ found that Plaintiff's residual functional capacity was to do light work.  In addition, the ALJ noted that Plaintiff was 40 years old on the date of his alleged onset of disability in 1993, and was 45 years old on the date he was last insured by Social Security in 1998, which makes him a younger individual as defined in the Social Security Act.[101]  The ALJ found that Plaintiff has a high school education, graduated from Appalachian Bible College, and attended auto mechanics school.[102]  The ALJ found that the issue of Plaintiff's transferability of work skills is immaterial due to his younger age.[103]  The Medical-Vocational Rules for light work direct a finding of "not disabled" for a younger individual, regardless of work experience.[104]

#### b. The ALJ Considered Plaintiff's Limitations from the Residual Functional Capacity Assessment

> Exertional limitations.  When the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect only your ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling), we consider that you have only exertional limitations.  When your impairment(s) and related symptoms only impose exertional limitations and your specific vocational profile is listed in a rule contained in appendix 2 of this subpart, we will directly apply that rule to decide whether you are disabled.

20 C.F.R. § 404.1569a(b).  The ALJ found that Plaintiff only had exertional limitations and did not

---

[101] *See* 20 C.F.R. § 404.1563 (age as a vocational factor); *see also* Tr. at 25; *see also* Comm'r. Doc. 19 at 2; *see also* Pl. Doc. 17 at 1.

[102] *See* 20 C.F.R. § 404.1564 (education as a vocational factor); *see also* Tr. at 25 & 34; *see also* Comm'r. Doc. 19 at 2; *see also* Pl. Doc. 17 at 1.

[103] *See* Tr. at 25.

[104] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.21.

have any nonexertional limitations (as of the date last insured on September 30, 1998).[105] A finding

of no nonexertional limitations permits the ALJ to directly apply the Medical-Vocational Rules to

decide whether Plaintiff is disabled.[106] A review of the evidence supports the ALJ's decision that

Plaintiff did not have any nonexertional limitations.

The record demonstrates that Plaintiff is treating his pain symptoms with conservative

measures. In December 2000, Plaintiff reported that he stopped all medications.[107] In September

2003, the State Agency Physician reported "no indication of pain medication being taken."[108] At

the ALJ Hearing, Plaintiff testified that he only takes pain medication when "it's really giving me

problems."[109] Plaintiff testified that the only pain medication he takes is Motrin 3 to 4 times a

week.[110] In addition, Plaintiff participates in numerous daily chores and activities and cares for his

personal needs.[111] Plaintiff testified that on good days, he can "walk a couple of miles" and lift "50

pounds."[112] In March 1989, Dr. Michael Green, an orthopaedic surgeon, noted that Plaintiff has full

---

[105] "Nonexertional limitations. When the limitations and restrictions...affect only your ability to meet the demands of jobs other than the strength demands, we consider that you have only nonexertional limitations or restrictions. Some examples of nonexertional limitations or restrictions include the following: (i) You have difficulty functioning because you are nervous, anxious, or depressed; (ii) You have difficulty maintaining attention or concentrating; (iii) You have difficulty understanding or remembering detailed instructions; (iv) You have difficulty in seeing or hearing; (v) You have difficulty tolerating some physical feature(s) of certain work settings, e.g., you cannot tolerate dust or fumes; or (vi) You have difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching." *See* 20 C.F.R. § 404.1569a(c).

[106] *See* 20 C.F.R. § 404.1569a(b).

[107] *See* Tr. at 249.

[108] *See* Tr. at 297.

[109] *See* Tr. at 50.

[110] *See* Tr. at 49-50.

[111] *See supra* discussion of Plaintiff's Daily Activities in Section II.D.3.b. of this Report and Recommendation.

[112] *See* Tr. at 24, 44, & 46.

range of motion of his arm, and there is a lack of physical evidence to support a lot of Plaintiff's pain complaints.[113] Dr. Green further stated:

> I can passively take [Plaintiff] to full forward elevation and [Plaintiff] can hold it there, however, he really puts up a fuss and looks like he can't hold it. This is very disturbing and I am not sure what his motivational status is at this time. Arthroscopically, the tendon had no evidence of irritation and he had no inflammatory bursae. He had no synovitis about the anterior chamber nor about the subacromial space.

*See* Tr. at 204. In August 1989, Dr. Thomas Holbrook, a neurological surgeon, evaluated Plaintiff and found a normal range of motion of the cervical spine and no appreciable spasm to palpation.[114] In June 2000, Iva Chapple, M.D., a chronic pain specialist, noted that Plaintiff's neck was supple with full range of motion and no masses or trachea midline.[115] In November 2003, Thomas Knutson, D.O., of the Center for Orthopedic Excellence, reported that Plaintiff has very good range of motion.[116]

In September 2003, a State Agency Physician determined that Plaintiff could do medium exertional work, including occasionally lifting 50 pounds and frequently lifting 25 pounds.[117] The State Agency Physician did not find any nonexertional limitations.[118] In January 2004, a State Agency Physician found that Plaintiff could do light work and had certain nonexertional

---

[113] *See* Tr. at 204 & 478.

[114] *See* Tr. at 209.

[115] *See* Tr. at 253.

[116] *See* Tr. at 277 (Dr. Knutson report); *c.f.* Tr. at 260 (business card for Dr. Knutson).

[117] *See* Tr. at 293.

[118] *See* Tr. at 294-96.

limitations.[119]  The ALJ's decision is basically a synthesis of the two opinions issued by the State

Agency Physicans.  The ALJ followed the 2004 State Agency Physician's opinion that the Plaintiff

could do light work and the 2003 State Agency Physician's opinion that the Plaintiff did not have

any nonexertional limitations.  The record in the case provides substantial evidence to support the

ALJ's decision that Plaintiff did not have any nonexertional limitations.

> Substantial evidence...consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance...Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment...if the decision is supported by substantial evidence.  *See Laws*, 368 F.2d at 642; *Snyder*, 307 F.2d at 529.  **Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence.** *King*, 599 F.2d at 599.  "This Court does not find facts or try the case *de novo* when reviewing disability determinations."  *Seacrist*, 538 F.2d at 1056-57; "We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of non-persuasion."  *Blalock*, 483 F.2d at 775.  **"The language of the Social Security Act precludes a *de novo* judicial proceeding and requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"**

*See Hays*, 907 F.2d at 1456 (emphasis added).  Therefore, this reviewing Court will uphold the

decision of the ALJ because substantial evidence supports the decision that Plaintiff did not have

any nonexertional limitations as of his date last insured on September 30, 1998.

**c.      The ALJ Directly Applied the Medical-Vocational Rules without Taking Vocational Expert Testimony to Conclude that Plaintiff is Not Disabled**

Since Plaintiff only has exertional limitations, the ALJ can directly apply the Medical-

---

[119] *See* Tr. at 315-18.

Vocational Rules to decide whether Plaintiff is disabled.[120]  Plaintiff complains that the ALJ did not

take testimony from Vocational Experts and instead applied the Medical-Vocational Grids.[121]

> First, the ALJ correctly applied section 202.21 of the Grids to [the plaintiff] because he is a younger individual, has a high school diploma, and is a skilled worker with non-transferable skills.  That section clearly indicates that an individual such as [the plaintiff] who is capable of working in the national economy is not disabled under the Act.  Second, the application of the Grids does not require the use and consideration of vocational expert testimony in cases such as this one where the [plaintiff] suffers only from exertional impairments.  *See Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir.1984); *Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983).  Third, the ALJ's determination that [the plaintiff] could perform "light work" is supported by substantial evidence in the record.

*See Hays*, 907 F.2d at 1458.  Therefore, in accordance with 20 C.F.R. § 404.1569a(b) and *Hays*, the

ALJ properly made a finding of not disabled from the direct application of the Medical-Vocational

Rules, and the ALJ was not required to take vocational expert testimony.  The ALJ found that

through the date last insured of September 30, 1998, in considering the Plaintiff's age, education,

work experience, and residual functional capacity, there were jobs that existed in the national

economy that the Plaintiff could have performed.[122]  The ALJ further found that based on the

Plaintiff's application for disability insurance benefits filed in July 2003, the Plaintiff is not entitled

to a period of disability or disability insurance benefits.[123]  The Court finds that substantial evidence

supports the ALJ's decision that through the date last insured of September 30, 1998, Plaintiff was

not disabled and could perform other work in the national economy.

---

[120] *See* 20 C.F.R. § 404.1569a(b).

[121] *See* Pl. Doc. 17 at 2, 4, 9, & 11.

[122] *See* Tr. at 25.

[123] *See* Tr. at 25.

## IV.     RECOMMENDATION AND CONCLUSION

The undersigned Magistrate Judge hereby **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Summary Judgment **[18]** and **DENY** Plaintiff's Motion for Summary Judgment **[16]** and **AFFIRM** the Decision of the Administrative Law Judge.  The Court notes the Plaintiff's objections to the ruling.

Within ten (10) days of receipt of service of this Report and Recommendation, any counsel of record may file with the Clerk of the Court any written objections to this Recommendation.  The party should clearly identify the portions of the Recommendation to which the party is filing an objection and the basis for such objection.  The party shall also submit a copy of any objections to the Honorable John P. Bailey.  Failure to timely file objections to this Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon this Recommendation.  28 U.S.C. § 636(b)(1).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

**DATED: June 12, 2009**

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE